1
2
3
4
5
6
7
8                        UNITED STATES DISTRICT COURT
                        WESTERN DISTRICT OF WASHINGTON
9                                  AT SEATTLE

10   UNITED STATES OF AMERICA,              CASE NO. CR11-131MJP

11                  Plaintiff,              ORDER DENYING MOTION TO
                                            SUPPRESS PHYSICAL EVIDENCE
12          v.                              AND MOTION TO SUPPRESS
                                            STATEMENTS
13   DREW YIM and SVETLANA ANGEL
     YIM,
14
                    Defendants.
15

16
            This matter comes before the Court on Defendant Drew Yim's motion to suppress
17
     physical evidence seized from his residence (Dkt. No. 372, 373), in which Defendant Svetlana
18
     Angel Yim has joined (Dkt. No. 385), and Drew Yim's motion to suppress statements (Dkt. No.
19
     404, 405).  The Court held oral argument on both motions on January 10, 2012.  At oral
20
     argument, the Government stipulated that it would not use the statements at issue in the motion
21
     to suppress statements.  The Court DENIES Drew Yim's motion on that issue as MOOT.  The
22
     Court has otherwise reviewed the motion to suppress physical evidence, the response from the
23

24

1 government (Dkt. No. 421), the reply (Dkt. No. 446), and all related papers.  The Court DENIES

2 the motion.

3 **Background**

4       The government has charged Drew Yim and eighteen other individuals with running a

5 large-scale drug trafficking operation based in Washington.  (Second Superseding Indictment

6 ("SSI") at 1-2.)  Members of the drug trafficking organization allegedly sold and distributed

7 cocaine, MDMA, marijuana and methamphetamine, and engaged in both money laundering and

8 wire fraud.  After extensive surveillance, including the monitoring of various wiretaps, Drug

9 Enforcement Agency ("DEA") agents believed they had sufficient probable cause to search

10 Drew Yim's home, which he shared with his wife, Svetlana Angel Yim.  On May 20, 2011, the

11 government applied for a search warrant to search Drew Yim's house.  The application was

12 supported by an affidavit from Special Agent Adam Otte and a financial affidavit from US

13 Marshals Service Assistance Chief Inspector Paul Baxley.  The reviewing magistrate judge

14 authorized the search on May 20, 2011, and agents searched Drew Yim's home on May 24,

15 2011.

16       Agent Otte submitted a one-hundred-eight page affidavit explaining to the reviewing

17 judge the nature of the information known about Drew Yim and the extent of the drug trafficking

18 in which they suspected he was engaged.  It explained the investigation's genesis in Arizona,

19 where Phoenix DEA agents learned of the existence of Yim's drug trafficking operation, and the

20 initiation of physical and telephonic surveillance of Yim and his associates from early 2010

21 onward.  Otte revealed that agents had observed Drew Yim receive and deliver large quantities

22 of drugs as well as cash.  The affidavit detailed two occasions where officers had reason to

23 believe that Yim had stored the substances at his home before delivering them to couriers.  The

24

Court provides some detail on these two incidents where agents believe Yim transported drugs to his home.

The first observation occurred in March, 2011, when agents learned that Yim was to receive a large shipment of cocaine for transport to Canada. Agents believed Yim was to receive a delivery of cocaine on March 15, 2011. That day, agents observed Yim leave his home, meet with several associates and allegedly take possession of 20 kilograms of cocaine. Agents listening to contemporaneous wirtetap intercepts were able to piece together that Yim was receiving 20 kilograms of cocaine. Agents then observed Yim return to his home at which point they believe he still had possession of the cocaine. Agent did not observe Yim enter the home with the cocaine, despite having a camera mounted on a camera somewhere outside of his home. The wiretap and other physical surveillance suggested that Yim had the 20 kilograms with him when he returned to his home, despite the fact the camera did not capture him bringing the drugs into the home.

The second observation began on March 28, 2011, when agents observed Yim meet with an associate and drive to a separate location where, based on the wiretap intercepts, agents suspected he received 30 kilograms of cocaine. Agents then observed Yim's car at his residence after the meeting the same day. Although one camera was set up outside of Yim's home, agents did not see Yim bring in anything that appeared to be 30 kilograms of cocaine. On March 29, 2011, the following day, agents observed Yim travelling from his house to a meeting point where he allegedly made a delivery to a suspected courier. Again, the cameras did not capture Yim carrying drugs from his house to his car, but Yim was not observed making any stops prior to meeting the courier. After the delivery, police stopped the courier and discovered 32 kilograms of cocaine in her car.

1	The remainder of Otte's affidavit details other drug transactions involving that agents had

2	observed and monitored with physical surveillance and wiretap intercepts.  Inspector Baxley's

3	affidavit detailed the financial investigation into Drew Yim and his wife, Svetlana Yim, which

4	led the government to believe that the two were engaged in extensive money laundering of the

5	proceeds of drug trafficking.  After reviewing the affidavit, the magistrate judge approved the

6	search of Drew and Svetlana Yim's home for evidence of drug possession, drug distribution,

7	conspiracy to distribute drugs, money laundering and conspiracy to commit money laundering.

8	During the search, agents seized cocaine, marijuana, MDMA, Oxycodone, drug packaging, and

9	over $300,000 in currency.

10	**Analysis**

11	In order to obtain a search warrant the government must demonstrate probable cause to

12	search the residence.  "[P]robable cause means a fair probability that contraband or evidence is

13	located in a particular place."  United States v. Kelley, 482 F.3d 1047, 1050 (9th Cir. 2007).

14	"Whether there is a fair probability depends upon the totality of the circumstances, including

15	reasonable inferences, and is a commonsense, practical question."  Id. (quotation and citation

16	omitted).  "In addition to a demonstration of probable cause as to criminal activity, a warrant's

17	validity is dependent on a showing that evidence probably will be found at the locations

18	searched."  United States v. Gil, 58 F.3d 1414, 1418 (9th Cir. 1995).  "Probable cause that a

19	resident of the location has committed a crime is inadequate, in itself, to satisfy this

20	requirement."  Id.  However, "Based on the nature of the evidence and the type of offense, a

21	magistrate may draw reasonable inferences about where evidence is likely to be kept."  United

22	States v. Garza, 980 F.2d 546, 551 (9th Cir.1992).  "In the case of drug dealers, evidence is

23	likely to be found where the dealers live."  Gil, 58 F.3d at 1418-19 (quotation and citation

24

1  omitted).  The Court is also to give "significant deference" to the magistrate judge's review.  Id.

2  at 1418.

3  Yim argues that his alleged status as a broker-level drug trafficker and the lack of any

4  observation of him entering or exiting his home with drugs reveals that the government lacked

5  probable cause to search his home.  In a vacuum, this argument has some legs.  When squared

6  with the actual attestations in the Otte affidavit, it has no traction.  First, agents observed Yim

7  engage in extensive efforts to organize and distribute drugs.  Through visual surveillance and

8  contemporaneous monitoring of wiretaps, they observed him take receipt of large quantities of

9  cash and drugs over an extensive period of time.  Yim does not challenge this aspect of the

10  affidavit.  Second, on two occasions, the government had well-founded beliefs that Yim stored

11  large quantities of drugs in his house before sending them out for distribution.  That Yim was not

12  simply selling drugs directly out of his house or using it as a central stash house is of no moment.

13  Indeed, Yim recognizes that "[t]he Ninth Circuit has affirmed searches of homes of individual

14  suspected drug dealers even where there was no direct evidence linking the homes to illegal

15  activity."  (Dkt. No. 446 at 3.)  Here, agents had at least two concrete examples where it was

16  exceedingly likely that Yim stored large quantities of drugs at his home.  The Court is not

17  persuaded by the argument that the lack of evidence gleaned from the cameras mounted outside

18  his home during these two incidents shows a lack of probable cause.  The Otte affidavit

19  contained a high level of detail of Yim's drug trafficking and raised a strong likelihood that his

20  home was used to store drugs and other evidence of drug trafficking.  The magistrate judge was

21  allowed to draw the inference that Yim was an active drug dealer whose home was likely to

22  produce evidence of drug possession, distribution, and conspiracy.  See Gil, 58 F.3d at 1418-19.

23  The search warrant did not lack probable cause to issue.

24

**Conclusion**

The Court is not convinced that the search of Yim's home was undertaken without probable cause. The Court finds that the supporting affidavits submitted to the magistrate judge contained more than adequate statements supporting the finding of probable cause to search Yim's home for evidence of drug possession, drug distribution, conspiracy to distribute drugs, money laundering and conspiracy to commit money laundering. The Court DENIES the motion to suppress. The Court DENIES the motion to suppress statements as MOOT, given that the government has stipulated not to use the alleged statements against Defendants.

The clerk is ordered to provide copies of this order to all counsel.

Dated this 19th day of January, 2012.

/s/ Marsha J. Pechman
Marsha J. Pechman
United States District Judge