UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　　　Plaintiff,<br><br>　v.<br><br>DREW YIM and RUBEN CAMACHO-CONTRERAS,<br><br>　　　　　　　Defendants. | CASE NO. CR11-131MJP<br><br>ORDER DENYING DEFENDANTS' MOTIONS TO SUPPRESS EVIDENCE OBTAINED FROM ELECTRONIC SURVEILLANCE AND DENYING IN PART AND GRANTING IN PART THE MOTION TO STRIKE CERTAIN JOINDERS |

This matter comes before the Court on Defendant Drew Yim's motion to suppress evidence obtained through wiretap surveillance, in which Ruben Camacho-Contreras has joined (Dkt. Nos. 489, 490, 525) and Ruben Camacho-Contreras's motion to suppress evidence obtained through wiretap surveillance (Dkt. No. 387, 526). Having reviewed the motions, the responses (Dkt. Nos. 411, 506, 540), the replies (Dkt. Nos. 434, 512), and all related papers, and having held oral argument on February 2, 2012, the Court DENIES both motions. The Court has also reviewed the Government's motion to strike Ruben Camacho-Contreras's and Hoang Lam's joinders in Drew Yim's suppression motion (Dkt. No. 532), the responses (Dkt. Nos. 551, 552),

and all related papers. As to Lam, the Court DENIES the motion as MOOT, and as to Camacho-Contreras, it GRANTS in part and DENIES in part the motion.

## Background

The Government has charged Drew Yim and eighteen other individuals with running a large-scale drug trafficking operation based in Washington. (Second Superseding Indictment ("SSI") at 1-2.) Members of the drug trafficking organization allegedly sold and distributed cocaine, MDMA, marijuana and methamphetamine, and engaged in both money laundering and wire fraud. Much of the information the Drug Enforcement Agency ("DEA") learned about the Yim organization was obtained through the use of wiretaps. Defendants have levied several attacks to the wiretaps used by the DEA in an effort to suppress the fruits of the surveillance. The Court has already heard and denied a motion for a Franks hearing. (Dkt. No. 478.) Drew Yim's and Ruben Camacho-Contreras's pending motions challenge the adequacy of the Government's wiretap affidavits as to: (1) the "full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous," as required by 18 U.S.C. § 2518(1)(c); and (2) the showing of necessity to use wiretaps instead of traditional surveillance techniques. Drew Yim specifically attacks the first wiretap obtained for target telephone one ("TT1"), while Ruben Camacho-Contreras focuses on the wiretaps obtained for TT9 and TT18. Drew Yim asks that if the first affidavit was inadequate that all of the following wiretap orders be found unconstitutional and that the evidence obtained from the wiretaps be suppressed.

A. <u>Wiretap Affidavit for TT1</u>

On March 29, 2010, Task Force Officer Jonathan Dittoe applied for a wiretap of a phone believed to be used by Drew Yim or his unindicted co-conspirator, Jonathan Ima. The forty-nine

ORDER DENYING DEFENDANTS' MOTIONS
TO SUPPRESS EVIDENCE OBTAINED FROM
ELECTRONIC SURVEILLANCE AND DENYING
IN PART AND GRANTING IN PART THE
MOTION TO STRIKE CERTAIN JOINDERS- 2

page affidavit provides a summary of the DEA's efforts to unearth evidence of a drug trafficking conspiracy in Western Washington associated with Yim and Ima dubbed the Ima Organization or Ima-Yim Organization, as well as facts about Ima and Yim individually. (Affidavit of Jonathan Dittoe dated March 29, 2010 ("First Dittoe Aff.").) Dittoe explains the nature of how the DEA learned of the two individuals and their suspected drug trafficking organization and the unsuccessful five months spent investigated the organization using conventional techniques. The objectives of the investigation are listed as identifying: (1) sources of cocaine being distributed by the Ima-Yim Organization; (2) locations and methods used to store, conceal, and distribute the drugs and drug proceeds; (3) methods used to launder drug proceeds; (4) members of the organization; and (5) assets obtained with the proceeds of illegal activity. (Id. ¶ 8.)

Ima and Yim came to the DEA's attention in late 2009 as a result of a Phoenix, Arizona DEA investigation into separate a cocaine drug trafficking organization. DEA agents discovered Ima and Yim had purchased and attempted to purchase upwards of 140 kilograms of cocaine from drug traffickers in Arizona. (First Dittoe Aff. ¶¶ 26-34.) Two confidential informants aided the DEA in identifying Yim and Ima as purchasers of cocaine. (Id. ¶¶ 36-37.) Through physical surveillance, police officers observed two individuals they believed to be Ima and Yim meet with a member of the drug trafficking organization the Phoenix DEA office was investigating. (Id. ¶ 35.) Officers confirmed the car the two drove was rented to Ima, and one of the confidential informants confirmed that Ima was one of the individuals who came from Washington to purchase cocaine in Arizona. (Id. ¶¶ 36, 40.) Further investigation showed Ima and Yim had travelled to Arizona, but little other surveillance could be obtained of any direct transactions. (Id. ¶¶ 42-45.) Efforts to use the two confidential informants in Arizona to do a buy-bust with Ima and Yim proved both impossible and counterproductive, as Yim and Ima

1 distanced themselves from the informants once efforts were made to arrange such a transaction. (Id. ¶ 38.)

As part of the DEA investigation in Phoenix, agents identified a "target telephone" they believed Ima and Yim used to arrange large cocaine purchases of cocaine. (First Dittoe Aff. ¶¶ 4-5, 46-57.) For example, calls intercepted in February 2010 involving TT1 showed that either Ima or Yim was using the phone to purchase upwards of forty kilograms of cocaine. (Id. ¶¶ 51-58.) DEA agents also obtained pen register and GPS evidence showing that the target phone used by Ima or Yim made a substantial number of calls to a phone in Mexico used by a known drug trafficker. (Id. at ¶¶ 58-63.) Travel records showed that Yim and Ima had traveled between California, Seattle, and Arizona with frequency, where they were suspected of arranging drug transactions. (Id. ¶¶ 42-44.) For example, on March 25, 2010, agents tracked Yim to Los Angeles, where they observed him meet with two Hispanic males, obtain shopping bags suspected to contain contraband and then conduct counter-surveillance driving maneuvers. (Id. ¶ 73.) DEA agents continued to investigate Ima and Yim through video surveillance, visual surveillance, and GPS tracking, but this did not afford them viable information to lead to arrests and the dismantling of the organization yet unknown in its full scope. (Id. ¶¶ 66-74, 79-89.) Agents were able to locate a storage locker in Washington that was used by Ima. (Id. ¶ 69.) They observed Ima and several others unload a truck at the locker, a canine unit used at the locker gave a "specific alert for narcotics" on March 4, 2010. (Id.) Agents also set up a pole camera near Yim's residence, and discussed the desired installation of a video camera at the residence. (Id. ¶¶ 75, 88.) Dittoe explained at some length about a financial investigation into the suspects and trash searches that were undertaken at Ima's residence that proved fruitless. (Id. ¶¶ 103-10, 114.) Dittoe's affidavit also provides background on what was known about Ima and

Yim individually, apart from their alleged organization. As the Court set out in its order denying Yim's Franks motion, the officers knew of past drug trafficking activity, but concluded that no confidential informants could be culled from those stale cases. A full review of that information is not repeated here.

Having listed the conventional efforts used to investigate the Ima-Yim Organization, efforts, Dittoe concludes that he lacked adequate conventional means to infiltrate the drug organization without a wiretap. Dittoe explains that the use of the informants in Arizona was not likely to be successful because Yim and Ima had severed ties to the drug supplier with whom they were connected. (Id. ¶¶ 37, 90.) Dittoe details that undercover agents, telephone tolls, pen registers, trap and trace devices, buy-bust operations, consensually recorded telephone calls, arrests, interviews, and searches were not likely to yield sufficient information to meet the goals of the investigation to take down the Ima-Yim Organization. A Judge in this District reviewed the affidavit and signed the order authorizing the wiretap on March 29, 2010.

B.  Wiretap Affidavit for TT9

On August 9, 2010, Special Agent Adam Otte applied for authorization to place a telephone intercept on TT9, a phone believed to be used by Camacho-Contreras. (Aff. of Adam Otte dated Aug. 9, 2010 ("First Otte Aff.").) Otte's fifty-nine page affidavit explained that the DEA had been using wiretaps since March 2010 to investigate the Ima-Yim Organization, and that agents believed TT9 was used by Camacho-Contreras to further the organization's trafficking efforts. The objectives of the investigation remained consistent with those set out in Dittoe's first affidavit. (Compare Id. ¶ 12 with First Dittoe Aff. ¶ 8.)

The Otte Affidavit explains in some detail what had been learned about the Yim organization since the DEA began using wiretaps in March. In late May, 2010, the DEA learned

that Yim had delivered nineteen kilograms of cocaine and five pounds of methamphetamines to a courier. (First Otte Aff. ¶ 6.) The DEA then stopped the courier and seized the drugs. (Id.) Intercepted calls from June 24 to 28, 2010, also led to the DEA learn that Yim sent $530,000 to Los Angeles using a truck that departed from Camacho-Contreras' home. (Id. ¶ 7.) Officers stopped the truck, driven by Belen Nieves, and discovered the cash on June 28, 2010, which they believed was partial payment for a twelve kilogram cocaine purchase. (Id.) Based on other intercepted calls and visual surveillance, DEA agents believed that Yim had also made large purchases of marijuana. (Id. ¶¶ 8-9.)

As to the necessity of the wiretap, Otte explains that Yim and Ima's efforts to evade detection and general suspicion made common investigative techniques unlikely to succeed. (First Otte Aff. ¶ 48.) Otte states that Yim had compartmentalized the use of phones, that he and others engaged in counter-surveillance driving techniques, and that the individuals used coded language to direct the trafficking operation. (Id.) DEA agents were also aware that Yim was suspicious of the seizure of the $530,000 in cash and began to determine whether he was under investigation. (Id.) Otte explains the investigation had revealed more evidence of the extent of the drug trafficking network, but that there were no inroads to using confidential informants. (See id. ¶¶ 53-77, 78-80.) Otte specifically notes that Yim, and Camacho-Contreras were experienced drug traffickers and that they had shown themselves to be suspicious of any investigation into their network, making the use of an informant unlikely to succeed. (Id. ¶ 80.) As an example, Otte repeats a recorded call where Yim stated that "I'm just worried about a set-up or something." (Id.) Otte further explains that physical surveillance and GPS monitoring had aided the investigation, but not yielded a complete picture of the organization. (Id. ¶¶ 82-111.)

Otte avers that performing arrests, searches and/or seizures would disrupt the full extent of the investigation and not likely gain sufficient evidence against the entire organization. (Otte Aff. ¶¶ 119-23.) For example, Otte states bluntly that though there was probable cause to search Yim's home because of his likely possession of marijuana at his home on May 29, 2010, an arrest would not lead to a prosecution on the larger drug trafficking operation he was running. (Id. ¶ 120.) After reviewing this affidavit, which incorporated all of the previous ones, the Court authorized the wiretaps.

C.      Wiretap Affidavit for TT18

On November 9, 2010, Otte applied for an extension of the wiretap of TT9 and a wiretap of a new number associated with Camacho-Contreras, TT18. (Otte Aff. dated Nov. 9, 2010 ("Second Otte Aff.").) Otte updated the Court on the progress of the investigation, noting that the Government had seized over $1,200,000 in currency since June 28, 2010, as evidence of drug trafficking proceeds. (Id. ¶ 6.) While the objectives of the investigation remained largely the same, the investigation had expanded to Canada, Milwaukee, Wisconsin, Minneapolis, Minnesota, and Los Angeles, California. (Id. ¶¶ 10, 57-60.) Otte explained that throughout October 2010, calls involving Camacho-Contreras on TT18 had been intercepted regarding the likely placement of drugs into compartments into cars for delivery. (Id. ¶¶ 62-64.)

The explanation as to necessity reflected the extent of new information obtained throughout the investigation and the continued need for wiretaps. (See Second Otte Aff. ¶ 53.) Otte explains that confidential sources were not likely to be useful despite several new potential sources. (¶¶ 73-85.) Otte marches through each possible informant and explains that in every instance the informants lacked strong ties to Yim, were not willing to cooperate, or were likely to disrupt the investigation if asked to turn on the organization. (Id.) One source of information

appeared to be cooperative and knowledgeable, but was unwilling to testify because he or she feared his or her family would be killed and Yim had already threatened him/her for being a suspected snitch. (Id. ¶¶ 82, 83.) Otte notes that Yim and Camacho-Contreras were experienced drug traffickers and had already shown themselves to be leery of dealing with anyone they suspected was an informant. (Id. ¶¶ 80, 85.) As such, no confidential informants then existed that could accomplish what a wiretap might. This was a substantially different discussion of informants than the TT1 and TT9 affidavits, reflecting the increased collection of information on Yim and Ima.

The showing of necessity is backed by an explanation that conventional means of investigation continued to yield incomplete information about the drug trafficking organization. Otte's affidavit explains in detail what physical surveillance had taken place and the limits on its reaches in gathering evidence sufficient to dismantle the operation. (Second Otte Aff. ¶¶ 86-110.) Otte also explains that video surveillance had actually proven to be counterproductive, as Yim revealed to Camacho-Contreras that he found the surveillance camera the DEA had installed outside of his home. (Id. ¶ 112.) Otte avers that the use of an undercover agent remained unreasonable, particularly since the DEA could not arrange to purchase the amount of cocaine that was being sold in this operation. (Id. ¶¶ 114-17.) Similarly, because of the amount of drugs being transacted, there was little hope of performing a buy-bust operation, particularly because of Yim's high alert for surveillance and informants. (Id. ¶¶ 120-21.) Otte also explains that the execution of search warrants and arrests was not likely to achieve the full goal of the investigation—the dismantling of the Yim Organization and arrests of all of its members—as they had yet to gather enough evidence and understand the scope of the organization. (Id. ¶¶ 123-28.) As to possible alternative sources of evidence gathering, Otte contends that interviews

of one potential informant in July, 2010, revealed the person had inadequate information to be of assistance. (Id. ¶ 131.) Otte explains that three couriers had been stopped by police, but that they had not been interviewed. (Id. ¶ 132.) After reviewing the affidavit, the Court authorized the wiretap.

**Analysis**

A.   Standard

The Ninth Circuit applies two standards of review to a challenge to the issuance of orders authorizing wiretaps. First, the court reviews de novo the question of whether there is a "full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c); United States v. Garcia-Villalba, 585 F.3d 1223, 1228 (9th Cir. 2009). Second, the court reviews the district court's decision "that the wiretaps were necessary for an abuse of discretion." Id. The Court is limited to the four corners of the affidavit when measuring necessity. United States v. Gonzalez, Inc., 412 F.3d 1102, 1112 (9th Cir. 2005). "When reviewing necessity we employ a 'common sense' approach to evaluate the reasonableness of the government's good faith efforts to use traditional investigative tactics or its decision to forego such tactics based on the unlikelihood of their success or the probable risk of danger involved with their use." Id. "This necessity requirement means that the affidavit must set out a factual background that shows that ordinary investigative procedures, employed in good faith, would likely be ineffective in the particular case." United States v. Brone, 792 F.2d 1504, 1506 (9th Cir. 1986). The Ninth Circuit has stated "that the wiretap should not ordinarily be the initial step in the investigation, but that law enforcement officials need not exhaust every conceivable alternative before obtaining a wiretap." United States v. McGuire, 307 F.3d 1192,

1196-97 (9th Cir. 2002). Further, when investigating a large conspiracy, the government has great latitude in the scope of the investigative techniques used. Garcia-Villalba, 585 F.3d at 1228.

Defendants argue that the Court should apply a de novo review to the showing of necessity. Defendants cite no case that stands for that proposition, but urge the Court to do so because this is the first time the allegations as to necessity are subjected to an adversarial challenge. The Court is not persuaded by this argument, given the fact this Court sits in the same position as the Ninth Circuit when reviewing an affidavit's showing of necessity. Both before this Court and the Ninth Circuit, the warrant has issued, the arrests have been made, and the adversarial process commenced. Prior to that, it is up to the reviewing judge to use her discretion to gauge whether the affidavit sustains a showing of necessity and that determination is entitled to deference under an abuse of discretion standard. See United States v. Velarde-Ozuna, No. CR 10–754–TUC–CKJ, 2011 WL 5007918, at *2 (D. Ariz. Oct. 20, 2011) (applying the abuse of discretion standard to the necessity element); United States v. Ai Le, 255 F. Supp. 2d 1132, 1133-34 (E.D. Cal. 2003) (same). The Court thus applies the abuse of discretion standard in analyzing the issue of necessity.

The Court also notes that it examines in detail only the affidavits for TT1, TT9, and TT18, as these are the only wiretap affidavits specifically challenged by Defendants. Yim has argued that if TT1 is inadequate that all others are similarly flawed. Having provided no specific arguments as to why the post-TT1 affidavits are invalid, Yim has not provided the Court with reason or basis to provide a detailed analysis of those affidavits. The order is thus limited to a comprehensive treatment of the affidavits supporting TT1, TT9, and TT18.

B.  Full And Complete Statement

The Court is satisfied that each of the three specifically challenged wiretap affidavits contains a full and complete statement explaining whether or not other investigative procedures had been tried and failed or why they reasonably appeared to be unlikely to succeed if tried or to be too dangerous. See 18 U.S.C. § 2518(1)(c).

In each affidavit, the Government explained what efforts had been undertaken, the shortcomings of conventional investigative techniques, and why they appeared unlikely to further the investigation. Yim and Camacho-Contreras used multiple phones, spoke in code, and conducted much of their business in an intensely secretive and hidden manner. Infiltration into the organization through informants or buy-bust operations appeared likely to fail, as Yim and others appeared apprehensive of dealing with anyone of an unknown character. This was apparent when Dittoe applied for the first wiretap. As the investigation proceeded, Yim appeared very nervous that he was being investigated and it appeared likely too much intrusion would ruin the investigation into the vast network of associates who formed part of the Yim Organization. Visual surveillance did not yield particularly useful information because much of the trafficking activities occurred out of view and in multiple stages involving multiple persons. The Court finds that the affidavits contained the full and complete statements as required by law.

Yim contends that the Government failed to satisfy 18 U.S.C. § 2518(1)(c) because it "conducted only a cursory investigation" before sought to use wiretaps and relied on boilerplate. The Court disagrees. First, the Dittoe Affidavit contains a substantial amount of information about efforts used by the DEA to learn of Yim and Ima's trafficking network that placed them as the buyers of huge quantities of cocaine before the Government sought a wiretap. The DEA conducted visual surveillance, interviews of confidential informants, tracking, and other conventional techniques to obtain useful information about Yim and Ima's activities. They

learned that the two had purchased very large quantities of cocaine and were looking to acquire even more. They had a reasonable basis the two operated a drug trafficking conspiracy, given the amounts being purchased and the interstate reach of their efforts. Yet, the Government lacked a means of infiltrating the network, and the DEA's use of conventional surveillance for roughly five months showed the limited utility of confidential informants and traditional surveillance. It is not accurate to conclude that the DEA made a cursory investigation before running to use wiretaps. Second, the affidavit did not contain only boilerplate assertions about why conventional tools were unlikely reveal the extent of the organization. The Government had indeed tried to obtain information through informants, which proved counterproductive. The Government also explained the physical surveillance conducted and the limits of its utility. The affidavits do contain statements from Otte and Dittoe based on their past experience, but it is presented in unison with what was known of the Defendants and why it showed that conventional means were not likely to be successful in indicting the entire Yim-Ima Organization. The lack of viable conventional surveillance continued to be true for the affidavits in support of tapping TT9 and TT18.

The Court finds that the affidavits do contain full and complete statements as required by § 2518(1)(c).

C. <u>Necessity</u>

The Court is also persuaded that the Dittoe and Otte affidavits for TT1, TT9, and TT18 contain sufficient showings of necessity.

The Court disagrees with Yim's assertion that the DEA merely presumed that Yim and Ima were involved in a drug trafficking organization as a means to obtain the wiretap authorizations. The DEA had learned from confidential informants and other surveillance that

Yim and Ima had attempted to purchase vast quantities of cocaine in Arizona and California, although the two were based in Washington. The quantities themselves were not for street level sales, but for large-scale distribution. Yim and Ima travelled a significant amount, and appeared to be meeting and talking with known high-level drug dealers. It does not appear that the DEA idly concluded that Ima and Yim were engaged in a drug trafficking conspiracy as a ruse to obtain a wiretap authorization. The description of the means employed by Yim and Ima when purchasing cocaine showed them to be experienced traffickers who were secretive, well-organized, and difficult to observe. It was reasonable for the DEA to conclude that they had happened upon not just two individuals operating in a vacuum, but two leaders of a drug trafficking organization. It was proper for the reviewing Court to consider the wiretap applications as targeting a drug trafficking organization and conspiracy. As such, the Court agrees with the Government that it was entitled to greater leeway to investigate the Ima-Yim organization through the use of wiretaps in order to crack into and understand the full scope of the group. See McGuire, 307 F.3d at 1197, 1198.

The Court also disagrees with Yim's and Camacho-Contreras's assertions that the affidavits did not contain a showing of necessity. The wiretap affidavits laid out what evidence had been learned up to the point they were submitted and explained why conventional means were of limited utility. Importantly, there did not appear to be viable confidential informants. As to TT1, the two confidential informants essentially ruined their utility when they tried to get close to Yim and Ima. As to TT9 and TT18, the DEA had yet to find any reliable informants despite several stops of couriers and interviews with them. Instead the Government found that the potential informants were untruthful, unknowledgeable or ultimately unable to assist the investigation. The Court recognizes that as of the application for TT18 the Government had

ORDER DENYING DEFENDANTS' MOTIONS
TO SUPPRESS EVIDENCE OBTAINED FROM
ELECTRONIC SURVEILLANCE AND DENYING
IN PART AND GRANTING IN PART THE
MOTION TO STRIKE CERTAIN JOINDERS- 13

stopped three couriers without also interviewing them. This fact alone does not suggest there was not necessity, as the government is not required to exhaust every possible avenue of surveillance, particularly where it has explained the limited utility of informants as to this particular organization. See United States v. Canales Gomez, 358 F.3d 1221, 1225-26 (9th Cir. 2004). The further the investigation proceeded, the more the Government learned that Yim was the head of a very complex and well-organized organization that used every effort to avoid dealing with strangers and to maintain secrecy. This further underlies the showing that confidential informants were of limited use, as were undercover officers. And because of the quantities of drugs, the ability to do a buy-bust was essentially beyond the DEA's means. The physical surveillance without contemporaneous wiretap observation also provided little window into what the organization was up to and how wide its operation spread. The reviewing judges who authorized the wiretaps of TT1, TT9, and TT18 did not abuse their discretion, as there were more than ample showings of necessity.

The Court also finds no merit to Camacho-Contreras's argument pressed at the hearing on February 2, 2012, that the reviewing judges should have denied the wiretaps because of the length of the investigation. As counsel admitted, there is no precedent that suggests a reviewing judge should tell the Government that it should simply wrap up its investigation, make arrests, and indict individuals because the investigation has used wiretaps for many months. It is not the reviewing judge's role to direct the investigation. Rather, she is to weigh the adequacy of the affidavit and ensure that there is a demonstration of necessity for the use of an intrusive wiretap. In the wiretaps challenged here, the Government went to substantial lengths to explain in frank terms what they had found in their investigation, what they still lacked, and why they needed wiretaps to develop this case against a well-organized, high-level drug trafficking organization.

They also explained why performing arrests, searches, and seizures would be premature, despite having adequate probable cause to do so. (See, e.g., First Otte Aff. ¶ 120.) The Court thus rejects Camacho-Contreras's argument on this issue.

On the basis of the four corners of the affidavits, the Court finds there to have been adequate showings of necessity. This is true even if the Court were to apply a de novo standard of review. The Court's independent review has not revealed to it any reasonable basis on which to find the affidavits lacked details about the inadequacies of conventional surveillance. None of the affidavits challenged (TT1, TT9, TT18) were inadequate. The Court finds no reason to suppress the fruits of these wiretaps. The Court also does not agree that the wiretap affidavits submitted after TT1 were merely boilerplate repetitions of the first. Yim has not provided any specific argument as to why they are inadequate and the Court finds no reason to suppress the fruits from those later wiretap authorizations. The Court's review of those affidavits reveals that the Government provided new information in each affidavit and explained the need for a wiretap without relying on the same reasons for a wiretap as urged in TT1. Indeed, a review of the affidavits of TT9 and TT18 alone show how the affidavits changed and provided reasoned arguments for new wiretaps. The Court thus DENIES Drew Yim's and Ruben Camacho-Contreras's motions in full.

D.  Motion to Strike Joinders

The Government has moved to strike Ruben Camacho-Contreras's and Hoang Lam's joinders in Drew Yim's motion. Because Lam has pleaded guilty, the motion as to him is DENIED as MOOT. As to TT9 and TT18, Camacho-Contreras has shown that he has standing to challenge the wiretaps affidavits and orders. The Court DENIES the motion as to those

affidavits. However, Camacho-Contreras has not shown standing as to any other wiretaps, and as to those, the Court GRANTS the motion and strikes his joinder.

**Conclusion**

The Court has not found any problem in the applications for wiretaps obtained in this case. While the number of wiretaps and length of their use is high in this case, they appear to have been properly obtained to investigate a large, complex, and well-organized drug trafficking operation that was suspicious of police surveillance, difficult to infiltrate, and evaded conventional surveillance. The Court finds that the wiretaps affidavits in support of TT1, TT9, TT18 contain full and complete statements as required by § 2518(1)(c), and that they contain showings of necessity. The Court DENIES the motions to suppress the fruits derived from those wiretaps. The Court also finds no reasoned basis to suppress the fruits of the remaining wiretaps, particularly in the absence of any specific arguments advanced by the Defendants. The Court also DENIES in part and GRANTS in part the motion to strike Camacho-Contreras's and Hoang Lam's joinder in Yim's motion.

The clerk is ordered to provide copies of this order to all counsel.

Dated this 7th day of February, 2012.

                                                Marsha J. Pechman
                                                United States District Judge